In the Matter of the Petition of the GILBERT ELEVATED RAILWAY COMPANY relative to acquiring title to real estate in the City of New York.

*Gilbert Elevated Railway Company — chap. 885 of 1872, chap. 837 of 1873, chap. 275 of 1874 — change in structure — Rapid transit act — chap. 606 of 1875 — constitutionality of.*

Chapter 606 of 1875, providing for the construction of steam railways in the counties of this State, is not a local act.

Section 4 of said act authorizes the commissioners appointed to decide as to the necessity of constructing a steam railway in any county, to locate the route of such railway over the streets, avenues, places or lands in such county, provided that the consent of the owners of one-half in value of the property bounded on and of the local authorities having the control of that portion of the street upon which it is to be constructed, be first obtained, or in default thereof, the determination of three commissioners, to be appointed by the court, that such road ought to be constructed. Section 36 provides that whenever the route so designated shall coincide with that designated by the charter of an existing corporation, the latter shall have the *like power* to construct and operate such railway, upon the fulfillment of the requirements and conditions imposed by

the commissioners, as a corporation specially formed under the act. *Held,* that where a corporation existing prior to January 1, 1875, the time of the taking effect of the constitutional amendments relating to the construction and operation of street railroads, availed itself of the privilege conferred by the latter section, it was not necessary for it to obtain the consent of the property owners and local authorities, or the determination by commissioners to be appointed by the court, as required by section 4 of the said act.

The right of an existing corporation to proceed under the said act is not affected by the fact, that the plans and specifications of the railway prescribed by the commissioners, differ materially from those contained in the charter of the company.

Such act does not in any way affect the franchise of the existing corporation, but only alters the mode in which it is to be used.

APPLICATION by the Gilbert Elevated Railway Company to procure the appointment of commissioners to condemn certain parcels of property, alleged to be essential for the construction and operation of their road, situated in South Fifth avenue, between Amity street and Amity lane.

The petition alleges the incorporation of the Gilbert Elevated Railway Company under the 885th chapter of the Laws of 1872, amended by the 837th chapter of the Laws of 1873, and the 275th chapter of the Laws of 1874. It alleges the location of their route by commissioners appointed by, and in pursuance of the said several acts, and alleges that the commissioners were proceeding with due diligence to avail themselves of their said franchise. That the legislature on the 18th of June, 1875, passed another act, entitled " An act to further provide for the construction and operation of a steam railway or railways in the counties of the State." This act is chapter 606 of the Laws of 1875.

The petition further alleges the appointment of commissioners, as provided for by the last mentioned act, and their determination upon the necessity of steam railways in the county of New York; and alleges that the said commissioners did fix and determine certain routes for such railways; and among other routes, did fix and determine a route in all respects coinciding with the route of the petitioners.

That the said commissioners subsequently fixed and determined upon plans for the building and construction of the railway to be built upon and over the routes designated by them, and imposed, in respect of the building of such railways, certain condi-

tions and requirements. That the petitioners intend to construct and finish an elevated railway over the route so designated, and intend to construct the same under the aforesaid modified plan of construction prescribed by said commissioners, upon and along the route aforesaid, and upon and along the said South Fifth avenue from Canal street to Amity street.

That the land described in the schedule C, annexed to the petition, was required for the purposes of the corporation of the petitioner, to wit, for the purpose of constructing, maintaining and operating said proposed road. That the respondents claim a right of property in the said land. That the petitioners have not been able to acquire title thereto, and cannot agree with the owners of such real estate for the purchase or use thereof; and pray for the appointment of three commissioners to ascertain and appraise the compensation to be made to the owners of the said land according to law.

The 885th chapter of the Laws of 1872, being the original charter of the Gilbert elevated railway, contained, in its third section, the provisions describing and regulating the railway, which the said company was authorized to construct, in the following language : " The said corporation is hereby authorized and empowered to make, construct and maintain an elevated railway, to be operated by the plan known as ' Gilbert's improved elevated railway,' over, through and along streets, avenues, thoroughfares and places of the said city of New York, and to construct, maintain and operate the said tubular ways and railways by atmospheric power, compressed air or other power."      *      *      *

Throughout the said act, whenever the structure of the corporation is alluded to, it is invariably described as the tubular ways and railways.

Chapter 606 of the Laws of 1875, provides for the appointment of commissioners, for the purpose of ascertaining the necessity of a steam railway or railways in any of the counties of the State. By its fourth section it is provided that if they find such railway or railways to be necessary, they shall, within sixty days after their organization, fix and determine a route or routes for such steam railway or railways, and the said commissioners shall have the exclusive power to locate the route or routes of such

railway or railways, over and under, through or across the streets, avenues, places or lands in such county, "except Broadway and Fifth avenue below Fifty-ninth street, and Fourth avenue above Forty-second street, in the city of New York, and except such portion of such streets and avenues as are already designated for the main line of, or occupied by an elevated or under-ground railway in actual operation, * * * and to provide for the connection or junction with any other railway or bridge, provided that the owner or owners of one-half in value of the property bounded on, and the consent also of the local authorities having the control of that portion of the street or highway upon which it is proposed to construct or operate such railway or railways, be first obtained, or in case the consent of such property owners cannot be obtained, that the determination of three commissioners appointed by the General Term of the Supreme Court, in the district of the proposed construction, given after a due hearing of all parties interested, and confirmed by that court, that such railway or railways ought to be constructed or operated, be taken in lieu of the consent of such property owners."

The thirty-sixth section provides that whenever the route or routes determined upon by said commissioners coincide with the route or routes designated by the charter of an existing corporation, formed for the purpose provided for by this act, provided that said corporation has not forfeited its charter or failed to comply with the provisions thereof, requiring the construction of the road or roads within the time prescribed by its charter, such corporation shall have the like power to construct and operate such railway or railways upon the fulfillment of the requirements and conditions imposed by said commissioners, as a corporation specially formed under this act.

It appears from the proofs taken in this proceeding, that the commissioners designated by the rapid transit act did determine that steam railways were required in the county of New York, and that the said commissioners, after such determination, proceeded to decide upon the plans for such railways, and to act upon the other matters which were placed within their jurisdiction by the rapid transit act.

In September, 1875, it appears that the Gilbert Elevated Rail-

way Company had petitioned the said commissioners to determine upon a rapid transit route, coincident with the then existing route of said company, and that in answer to the said petition, the commissioners requested that the said company should bind itself to the performance and conditions of the requirements, which they should establish in regard to the proposed railway.

The petitioners thereupon passed a resolution, whereby they engaged to submit to such conditions and requirements in respect to structure and otherwise, as might be imposed by the said rapid transit commissioners.

The petitioners had entered upon the construction of their railway in conformity with the commissioners' plan, and were proceeding with the same upon the Sixth avenue, when their further progress was stayed by an injunction by the Superior Court of the city of New York.

The present application seeks to condemn property over the line of their route, the title to which they seek to acquire for the purpose of constructing the modified road, as prescribed by the said rapid transit commissioners.

*Grosvenor P. Lowry, John K. Porter* and *Charles Francis Stout,* for the petitioner.

*Wm. M. Evarts* and *E. Ellery Anderson,* for owners of the property.

BRADY, J.:

The Gilbert Elevated Railroad Company was, by its charter, authorized to build an elevated road, according to the plans therein designated. The charter passed in 1872 was amended by acts passed in 1873 and 1874; but the principle of construction was not changed in any respect. It is clear, therefore, that, until the passage of the so called rapid transit act of 1875, if the company constructed any road, it would necessarily be upon the plan known as the Gilbert elevated railroad; but the franchise was secured and could be employed in the manner designated. The company, in other words, was created with all necessary powers; none of which were warped or destroyed. It was an existing company, requiring

no further legislation to give it either vitality or the necessary authority to carry out the purposes of its incorporation; it was intact, and a power. The thirty-sixth section of the rapid transit act recognized this indirectly. It provides that, whenever the route or routes determined upon by the commissioners to be appointed, coincide with the route or routes covered by the charter of an existing corporation, formed for the purpose provided for by the act, such corporation should have the like power to construct and operate such railway or railways, upon the fulfillment of the requirements and conditions imposed by said commissioners, as a corporation specially formed under the act, provided such corporation had not forfeited its charter or failed to comply with the provisions thereof requiring the construction of a road or roads within the time prescribed by its charter.

The evident design of this provision was to prevent any conflict between existing but unexecuted charters and companies to be formed under the act; and, at all events, to secure to the people the advantages of an elevated road over the route selected. If the chartered company chose to adopt the route, they could do it by virtue of a quasi prior claim founded upon a vested right; and if not, then they abandoned the opportunity to avail themselves of it, and another could use it. They were not to be permitted, by a *claim only*, to prevent the consummation of rapid transit, which was the chief object of the act. It conferred the right to adopt the model prescribed by the commissioners to be appointed, upon fulfillment of the requirements and conditions imposed by them. It was not a right given to create or construct a road or railway, for that had already been granted and secured by the charter of the company, but an exercise of the right in a manner other and different — it might be in model — from that required by its charter. It authorized a change in engineering and in the mechanical details of the superstructure, if the company complied with the conditions lawfully imposed by the act. And, though magnified into a supposed fatal departure from the original charter, because of a supposed conflict with the provisions of the Constitution, it is in effect nothing more than this. The act of 1875 is not a local act, we have so declared; the charter of the Gilbert elevated road was predicated of the general laws with which it was

required to comply. This general act — the so called rapid transit act — recognized the existence of the company, as already suggested, and by a general, not special provision, protected it against the consequences which might issue if its existing authority, legally and constitutionally conferred, was by conflict endangered or interfered with; and to make its exercise certain, extended to it the right to accept the route established by the commissioners in compliance with their requirements. The effect was not to change the entire character of the franchise; it was to be an elevated road, though different perhaps in its construction, mode of transit and propelling power. The legislature had reserved to itself, by section 10 of the act of incorporation, the power to alter, amend or repeal the charter, and had the undoubted right, therefore, to make such modifications in the structure as were deemed essential either to the public safety, the better preservation of the rights of the property owner, or the more successful accomplishment of the end in view by the act of incorporation.

The question as to such power has been considered and passed upon. (*Suydam* v. *Moore*, 8 Barb., 355.) The change from a tubular to an open or covered railway would be within this power. It would affect the model to be employed — the mode in which the franchise was to be consummated, but not otherwise. The right to the benefit and advantage of the result would be preserved and the franchise therefore held intact. The legislature have in many instances made substantial changes or modifications of existing charters, by which new elements were introduced, new features engrafted upon them, without violating constitutional provisions prohibiting new creations of a kindred character. (*Mosier* v. *Hilton*, 15 Barb., 663; *Syracuse City Bank* v. *Davis*, 16 id., 188; see, also, *Zabriskie* v. *Hackensack and N. Y. Railroad Co.*, 3 C. E. Green, 178, 192; *Veazie* v. *Mayo*, 45 Maine, 562; *Buffalo, etc., Railroad* v. *Dudley*, 14 N. Y., 348.) In *Mosier* v. *Hilton* (*supra*) it appeared that an act was passed authorizing an existing railroad company to sell its property and franchises, empowering the purchaser to issue stock and choose directors to manage and organize the corporation by any new name, and declaring that when so organized the company should have the same powers, etc., as the existing company, and it was held not to create a new corporation.

The court said : "It is also objected that the act of 1850, for the relief of the creditors of the railroad company, is in conflict with section 1 of article 8 of the Constitution.   It is insisted that the legislature, by the act of 1850, created a railroad corporation by a special act.   *   *   *   The act of 1850 created no new corporation.   The Lockport and Niagara Falls Railroad Company was incorporated in 1834 ; its charter had several times been amended, and it possessed property, franchises, rights and privileges which, under the act of 1850, were sold ; and the company was organized anew by choosing new directors and by changing its name.   It is a continuation of the first corporation under a new name."

In the case of *The Syracuse City Bank* v. *Davis* (*supra*), it appeared that a bank having been organized under a certificate insufficiently subscribed and acknowledged, an act was passed declaring that it should be deemed a valid corporation, notwithstanding any such defect.   In an action by the bank against the indorsers of a note which it had discounted, it was held that the act in question did not create a banking association within article 8, section 4 of the Constitution.

The court said : "It is scarcely necessary to notice the objection that this act of 1852 violates the Constitution by creating a corporation by a special charter.   (Const. 1846, art. 8, § 4.)   The act does not profess to create a corporation, it only remedies defects in one already created.   The institution may be said to have the powers and rights of a bank doing business *de facto*, while its rights were imperfect *de jure.*   The statute in question was of a class of acts, entitled to be most liberally construed, for the advancement of the public welfare and the promotion of individual rights."

In *Zabriskie* v. *Hackensack and New York Railroad Company* (*supra*), the court said : "The power is to alter or modify the act, and the true construction of this I hold to be an alteration of something contained in or granted by the act.   Any of the franchises granted may be altered — the right to take land by condemnation, the right to take tolls or fare, or the amount to be taken.   But the legislature had no right to impose upon the company any other duty, or any thing involving any other duty, than that attending the building a railroad from the Paterson road to Hackensack ;

any thing in the manner of doing that they had a right to change."

In *Veazie* v. *Mayo*, an act prohibiting any railroad from crossing any city street without the consent of the city, in writing, stating the manner in which the crossing shall be made, was held to be " only the exercise of that police power, which is always necessarily retained by the people in their sovereign capacity, for the security of the public safety, and of which they cannot be divested by legislative enactments or chartered immunities."

In the case of *The Buffalo Railroad* v. *Dudley* (14 N. Y., 336), it appeared that an act of the legislature amended the charter of a railroad company, by doubling its capital, adding fifty per cent to its authorized length, changing its terminus from a village to a city thirty miles distant, and altering its corporate name.  The court said : " The change was not fundamental.  The new powers conferred are identical in kind with those originally given.  They are enlarged merely, the general objects and purposes of the corporation remaining still the same.  It may be admitted that, under this reserved power to alter and repeal, the legislature would have no right to change the fundamental character of the corporation, and convert it into a different legal being, for instance, a banking corporation, without absolving those who did not choose to be bound.  But this they have not attempted to do.  The additional powers are of the same character."

The provision under discussion in the act of 1875 is not an amendment of the Gilbert elevated railroad act.  The effect of it, so far as it relates to the company, is to declare the route it may employ in the use of its franchise.  It neither changes its character nor enlarges its power or franchise.  It recognizes the rights of the company as existing by a general provision, and protects them, and by so doing prevents a conflict which might otherwise arise from the exercise of these rights, secured, as suggested by the act of incorporation, and those amendatory thereof.  It does not purport to be an amendment of the act of incorporation, in terms or in effect.  It is a recognition, and not a creation in substance or effect.  The body of the franchise remains the same, although the mode of its use has been changed in some respects.  This change the legislature reserved the right to make, and have made it.  It

differs, therefore, essentially, from the cases in Iowa and Ohio to which we were referred as illustrations of the proposition that the act of 1875 relating to the company was repugnant to the Constitution. In *Atkinson* v. *The Marietta and Cincinnati Railroad Company* (15 Ohio St., 21), which is one of these cases, the court, under a Constitution which declares that the general assembly shall pass no special act *confirming corporate power*, held, that the charter of the Marietta and Cincinnati Railroad Company did not authorize it to mortgage or sell its corporate franchise; and that a judicial sale upon a mortgage executed by it would not invest the purchaser with any corporate capacity whatever; and that a special act of the general assembly undertaking to give effect to the sale, and authorizing the purchasers to reorganize, create a new stock, and elect another board of trustees, was, in substance and effect, an attempt to create a corporation and to confer powers by a special act.

The answer to that case is, that an act of our legislature containing, by amendment, authority to sell the franchise, rights and privileges of a railroad corporation, and to invest the purchasers at once with them, was held not to be repugnant to that provision of our Constitution which declared that corporations might be formed under general laws, but should not be created by special act except for municipal purposes. It was said by the court that the act was a continuation of the first corporation, although, by the sale, the company was organized anew by choosing new directors and by changing its name. (*Mosier* v. *Hilton, supra.*)

In the case of *State of Ohio* v. *City of Cincinnati* (20 Ohio St., 18), another of the cases referred to, it' appeared that the general assembly, by an act passed by them, assumed to confer upon the corporation of Cincinnati additional powers. On certain conditions the act purported to confer on it the powers of municipal government, the power of political regulation and of judicial jurisdiction, and taxation and assessment, over a number of outlying incorporated suburban villages and other territory not before within the limits of the city, and it was declared repugnant to the provision of the Constitution prohibiting the passage of a special act *conferring corporate power*. The statement of that case shows that it in no respect corresponds with this. The act was a flagrant

violation of the Constitution. In the case of *Ex parte Samuel Fritz* (9 Iowa., 30), it appeared that an act was passed amendatory of the act to incorporate the city of Davenport, by which the office of police magistrate was abolished, and it was held to be invalid because special laws for the incorporation of cities and towns were prohibited by the Constitution of the State. There are many suggestions as to the authority of the legislature to amend an act the *passage* of which would, under the existing Constitution, be prohibited, but the act, so far as revealed in the case, was an attempt not to create or incorporate one, but to change the judicial system of one in existence with vested rights. The case is an authority for the State in which it was decided. It can have no extra territorial force save in a controversy presenting substantially the same elements. It must be borne in mind that in this case, as in the other, the original act was sought to be amended. Here there is no amendment under consideration. It must also be kept in view that, by a well established rule in this State, an act of the legislature will not be declared unconstitutional unless it is clearly repugnant to some provision of the Constitution. The rule is, indeed, too well settled to require the citation of cases to sustain the assertion that it is so. In this case the clear violation of a constitutional provision is not only not shown, but it seems to be clear, upon general principles and adjudged cases, that none has been committed.

Having arrived at these conclusions, which cover the vital questions in this matter, in my judgment, I cannot concur with Justice DANIELS. We differ too much in our views to make a concurrence possible. Rapid transit, it may be said, in conclusion, is one of the objects of our municipal life which our people regard as of great importance. It involves a public improvement, and public improvements always involve sacrifice. The greatest good of the greatest number is justly the grand purpose of good government, and the comparatively few who are injured are required to submit to the laws of their rulers.

It is the consciousness that there are some of our people who, by the construction of the Gilbert Elevated Railway as contemplated, will be injured in their estates, if not ultimately, at least in the beginning, which makes the consideration of this matter an

unpleasant duty, and impresses the conviction that if means to award ample compensation to property owners along the route had been provided, our sense of justice would have been gratified The law as it exists does not require this from the company, and the court can neither legislate nor undo legislation which does not conflict with the provisions of the Constitution ; and when called upon to declare whether an act of the legislature is or is not valid, must be governed, as it is, by the principles applicable and controlling. It follows from these views that the application should be granted.

Ordered accordingly.

Davis, P. J., concurred.

Daniels, J. (dissenting) :

The petitioner is a railroad corporation incorporated to construct and operate an elevated railway in certain streets of the city of New York, by chapter 885 of the Laws of 1872. (Vol. 2 of Laws of 1872, 2179.) By section 3 of the act it was given all the rights, powers and privileges, and rendered subject to all the provisions of the act passed on the 2d of April, 1850, to authorize the formation of railroad corporations and to regulate the same. By the provisions of that act, as well as another contained in its own act of incorporation, the petitioner was empowered to acquire the title to land required for the purposes of its incorporation, or which should be necessary to enable it to construct, maintain and operate its railroad. (Gen. Stats. N. Y., vol. 3, 621, § 14.) This right, by the plain import of the terms creating it, was limited to such lands as should be required for the purposes of its incorporation, or for constructing, maintaining or operating its railroad. And it consequently follows from the restriction so imposed, that if the railroad proposed to be constructed proves, for any reason, to be one which the company cannot erect and maintain, that it has no power to acquire the title to land over which it has been projected ; for that cannot be necessary for it to obtain, which it has not the power afterwards to lawfully use for any of the purposes of its incorporation. It is insisted on behalf of the landowners that such a disability has been shown by way of answer to the petitioner's

application in this proceeding.   If it has, that should be deemed sufficient to require a denial of the present motion.

By the act of its incorporation the petitioner was incorporated for a specific object, and that was to construct and maintain an elevated railway, " to be operated by the plan known as ' Gilbert's improved elevated railway,' over, through and along streets, avenues, etc., of the city of New York, and to construct, maintain and operate the said tubular ways and railways by atmospheric power, compressed air, or other power."   (Laws of 1872, chap. 885, § 3.)   That was the franchise and substantial grant of authority given to the corporation.   And what was added beyond that was simply incidental and for the promotion of the object in that manner described ; and that accorded with the principle of the Gilbert invention as it at that time existed.   It was so understood by the legislature as well as the railway company ; for, wherever the kind of railway which was to be constructed was mentioned in the charter, it was designated as a tubular railway.   This expression was the common one, adopted to describe the enterprise ; and it will be found to be contained and repeated in the act whenever the railway is in any manner referred to.   The same understanding pervades the amendatory acts of 1873 and 1874.   In the first it is "the said railway," and "said road," which has been made the subject of further legislation ; and in the last it has been mentioned as "its tubular ways and railways," that the company had been empowered to construct. (Laws of 1873, chap. 837 ; Id., 1874, chap. 275.)   The description of the structure authorized by the charter was in no ways changed by the subsequent legislation ; it still continued to be the tubular "ways and railways," known in 1872 as the Gilbert improved elevated railway, and nothing different from that.   And that railway was required to be "substantially supported above the middle of the streets and avenues, by iron arches which shall span the same from curb to curb, the bases of which shall not, when practicable, be more than sixty feet apart, nor the arches less than fifty feet from each other."   (Laws of 1872, chap. 885, § 4.)

It has been urged that the mode of construction was not intended to be a limitation of the grant or franchise, but in the nature of a condition of its existence, which the State alone can take advantage of if the petitioner shall fail to perform it.   But that view

can hardly be sustained consistently with the charter, which in direct terms has authorized the company to construct and maintain only that form of railway which it has described.

The object the petitioner was empowered to accomplish was specific; and the mode in which it was to be done was plainly designated. It was the grant of the authority as well as a description of the mode in which it was designed that it should be exercised. This construction is a more essential one to be applied and observed in such a case as the present one, than it would be if the company had been incorporated to construct a railway over its own land. There the plan might well be changed without detriment to the rights or privileges of others. But the petitioners railway was to be constructed upon a superstructure erected in the public streets and avenues of the chief city of the republic, having a large and active population, for whose convenience the streets themselves were opened and maintained; and as to such streets and avenues it is to be presumed that great legislative care would be observed, in providing the manner in which the railway should be constructed, in order to guard against their needless obstruction. If the system had been left to the discretion of the company, it might under such authority render the streets and avenues worthless for all ordinary purposes, and that possibility was a subject which required to be properly guarded against. The enterprise was a novel one, and to a great extent in the nature of an experiment; and it was undoubtedly intended that care should be observed in defining the grant of authority under which it should be tried. The language of the act indicates that the legislature was actuated by that purpose, and these considerations sustain the propriety of such a construction of it. The intention was to empower the company to construct a railway according to the invention mentioned, and that was a tubular railway, to be placed on the superstructure mentioned in the act, which, in the judgment of the legislature, would not deprive the streets and avenues of the city of their ordinary utility.

But if it be conceded that the description of the manner in which the structure should be made was simply in the nature of a condition, the non-observance of which could only be taken advantage of by the State, the case would not be essentially different in this respect; for even as a condition it would indicate the manner

in which it was intended by the legislature that the railway should be built; and if it were not built according to the plan prescribed by the condition, it would still be as much a different road from that mentioned in the charter of the company, as it would be if the description given were a limitation upon the power of the company. In either case it would be equally the intention of the law, that the structure should conform to the description given of it. And making it differently would be the construction of a different device, as much in the one case as it possibly could be in the other. It was intended by the act that the structure should be what the legislature took pains to describe and declare; and the company cannot lawfully make a different one under the authority conferred by the charter, even if the limitation upon its power has been given the form of a condition merely. The court, certainly, should not sanction by its authority a plain departure from what may be regarded as duly a legislative condition.

It was on the improved plan then invented and existing that it was declared that this railway should be made. That was plainly expressed in the act; and to that the company should be restricted in the construction of its authority. If a different mode of construction is to be adopted the authority for it cannot be found in the charter nor any of its amendments. Its powers in that respect have not been extended, by the amendatory acts, beyond the original grant. And the railway, as that described it, is not the one which the petitioner now proposes to construct, and it consequently must be held to follow that its charter does not warrant or allow its present enterprise.

The stipulation entered into on behalf of the petitioner shows the two enterprises to be essentially different. According to that, " no tubular ways for the transmission of cars and passengers by the application of atmospheric power, compressed air or other power, are intended to be constructed." And that involves an abandonment of the railway described in terms in the petitioner's charter. For the road, as it is now proposed to build it, " is to be, in all respects, constructed and operated in conformity with the conditions and restrictions prescribed by the commissioners of rapid transit." These commissioners were provided for and appointed under the authority of chapter 606 of the Laws of 1875. This is

a general law prescribing the terms on which elevated railways may be constructed and operated in all portions of the State. And the authority created by it is ample for the inclusion of all feasible plans which may be found promotive of that end. And they are to be devised and adopted only by the commissioners, whose appointment it has provided for. (Laws of 1875, 741, chap. 606, § 5.) It is according to their plan, which differs very materially from that of the petitioner's charter, and in no way includes a tubular railway, that it is now proposed to construct the railway. That is clearly indicated from the description given of the design itself by the commissioners, and it is implied by the terms of the stipulation already referred to. Indeed, if there had been no material difference intended, the petitioner would have been in no need of the authority of the commissioners acting under the act of 1875. It was because it was necessary to avail itself of the authority of that act that it was induced to adopt their plan.

And to empower it to do that the petitioner itself, by resolution, declared that its structure should "be an elevated double track, elevated railway, to be constructed, in all substantial respects, in accordance with plans and specifications to be made and agreed to by the president of this company and the said board of commissioners." And that board required the railroad of the company to be constructed "with such modifications of the original plans, upon which said company was by its charter authorized to construct the same, as to make the same correspond with the plan or plans, and mode of construction, which shall hereafter, in due course, be decided upon by this board of commissioners for said route." And in prescribing that mode the company was required by them, to so modify the plan of structure which said company is now authorized to construct, as to conform to the specifications and requirements following; and that was followed by a minute and explicit description of the plan adopted for the superstructure, as well as the railway, differing materially from that described in the charter of the company. It was clearly so understood by the commissioners, who, in their report of the arrangements made with the petitioners, stated that the structure that it was required by its "charter to build was so costly, that after three years of effort the company had been unable

to procure the money to erect it;" and that it was of the opinion that if it should be required "to build upon their route a structure sufficient for the public wants, but less costly than that originally intended, they would be enabled to carry on the work." And the commissioners add that they "were satisfied that the location upon their chartered routes of rapid transit roads under this act," which was the act of 1875, "accompanied by the conditions above mentioned, would, humanly speaking, render success certain."

This evidence that the petitioner is not proceeding, and does not propose to proceed with this enterprise, under or according to the requirements of its chartered authority, is entirely decisive of the fact. The railway now designed to be constructed, and for the support of which the land desired is required, is not the one described in its charter, but that which has been devised by the commissioners acting under the authority alone of the act of 1875.

In constructing such a railway as that, the petitioners will not proceed under its act of incorporation or either of the amendatory acts, but under the authority of the law of 1875; and before it can be permitted to exercise that authority it must comply with the constitutional provision under which it was enacted. That provision declared that "no law shall authorize the construction or operation of a street railroad except upon the condition that the consent of the owners of one-half in value [of] the property bounded on, and the consent, also, of the local authorities having the control of, that portion of a street or highway upon which it is proposed to construct or operate such railroad, be first obtained, or, in case the consent of such property owners cannot be obtained, the General Term of the Supreme Court in the district in which it is proposed to be constructed may, upon application, appoint three commissioners, who shall determine, after a hearing of all parties interested, whether such road ought to be constructed or operated; and their determination, confirmed by the court, may be taken in lieu of the consent of the property owners." (Art. 3, § 18, of the Constitution as amended.) This provision, it is conceded on the part of the petitioner, has in neither respect been complied with by it. And as no law afterwards enacted upon this subject could provide for a street railway and at the same time dispense with that compliance, it would seem to follow, very clearly, that

the petitioner has no legal right to construct or maintain the railway as that is now designed to be done. The Constitution deprived the legislature of the power to authorize the construction of a street railroad of any description on any different terms than those expressed by this provision. By availing itself of the privileges secured by the act of 1875, the petitioner's franchise has become qualified and subordinated to that extent to this prohibition of the Constitution. It proposes to build a railway which it could not construct without the assistance and authority of that act, and under the express terms of the Constitution, that can only be done by first procuring the assent of one-half in value of the property owners on the street, or the determination of commissioners that it ought to be constructed; without one or the other it cannot avail itself of the privilege to build a railway, created by a law which was only properly enacted under and subject to the restraints of this constitutional authority.

Beyond that, the act, in terms, imposes the same restraint upon the enjoyment of this corporate privilege by means of its own provisions. And while corporations then created and existing for the construction and operation of elevated railways in any portion of the State were empowered to proceed under its authority, the right to do so was rendered subordinate to the requirement of the constitutional restraint previously imposed on street railways afterwards to be provided for. The language of the act affecting this subject declared that "whenever the route or routes determined upon by said commissioners coincide with the route or routes covered by the charter of an existing corporation, formed for the purpose provided for by this act, provided that said corporation has not forfeited its charter or failed to comply with the provisions thereof requiring the construction of a road or roads within the time prescribed by its charter, such corporation shall have the *like power* to construct and operate such railway or railways upon fulfillment of the requirements and conditions imposed by said commissioners, as a corporation specially formed under this act." (Laws of 1875, 750, chap. 606, § 36.)

It was no part of the purpose of this provision to relieve the existing corporations from the restraints of the constitutional provisions upon enterprises of this description afterwards authorized,

but simply to entitle each of them to the privilege under it, which a new corporation formed for the construction of an elevated railway would have by virtue of its enactment. The petitioner's route did coincide with one of the routes determined upon by the commissioners' proceeding under the act, and, accordingly, it was entitled to the privilege·mentioned in the section already referred to, which secured to it the right to construct the railway under its provisions. But it was not designed, and the language used will not admit of the construction, that it could do that without complying, by means of one of the alternatives mentioned, with this provision of the Constitution. That is entirely evident from the language employed in the act. It was not used in such a manner as to give to any existing corporation the unqualified right to construct and operate an elevated railway. In view of the prohibition of the Constitution, the legislature could not have supposed that its powers extended so far as to allow the creation of such a franchise. And there is direct evidence of the existence of an intention to make no such provision. What the legislature did by this section was to secure to the existing corporation, found in possession of the franchise mentioned, the like power to construct and operate such railway as a corporation specially formed under the act. And that was a qualified power, conditional upon the assent of the owners of one-half in value of the property bounded on the streets and avenues to be used, or the favorable determination of the commissioners to be appointed by the court, that the railway ought to be constructed or operated. (Laws of 1875, 740, 741, chap. 606, § 4.) The corporations formed under that act were, by clear and explicit terms, required to procure the observance of one or the other of those alternatives before their right to construct and operate an elevated railway could become complete. And the like power which was all that was given to the petitioner, depended upon the observance of the same condition. It could not otherwise be a like power. But without that obligation it would be unconditional and unqualified by this limitation. That would be a more extended power than any corporation formed under the act could, by any possibility enjoy, and which it was not the design of the law to create. What was intended was, that an existing corporation should be accepted as having only the same authority as one formed under this

act. In the former case the corporation was already created, which in the latter the legislature had provided should be organized. And its existence was accepted as a practical compliance with those provisions, declaring the manner in which a new corporation for this object might be formed. And upon such a corporation the privilege of constructing and operating such an elevated railway as should be devised by the commissioners, acting for that purpose, was conferred. And that was no other or different railway than that which could be constructed after the plans of the commissioners. (Laws of 1875, 741, chap. 606, § 5.) The newly formed, as well as the previously existing corporations, were invested in this respect with an identical authority. It was a like franchise and power to all, and as it could not be exercised in one class of cases without one of the forms of consent mentioned in the Constitution, it is very clear that the same disability was designed to affect the others as well. Before the petitioner can construct the railway as that is now proposed to be done by it, which is conformably to the plans of the commissioners, and not according to the description and design of its own charter, the contemplated consent must be secured by it, and as that has not been done, the present application should be denied, without considering the other objections made in behalf of the owners of the land.

Application for commissioners granted, commissioners to be selected on two days' notice.